UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARIO PAREDES GARCIA, | CASE NO. 3:21-cv-05148-LK |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES AND COSTS |
| v. | |
| HARBORSTONE CREDIT UNION, | |
| Defendant. | |

This matter comes before the Court on Plaintiff Mario Paredes Garcia's unopposed Motion and Supplemental Motion for Final Approval of Class Action Settlement and Attorneys' Fees and Costs. Dkt. Nos. 42, 46. For the reasons discussed below, the Court GRANTS Mr. Paredes Garcia's motions as set forth herein.

## I.    BACKGROUND

### A.    Factual Background and Procedural History

Mr. Paredes Garcia is a noncitizen resident of Gig Harbor who was granted protected status under the Deferred Action for Childhood Arrivals ("DACA") program. Dkt. No. 1-1 at 1–2. Harborstone is a Washington-based credit union with a majority of its branches located in Pierce

County. *Id.* at 2. On April 22, 2020, after previously being granted an auto loan from Harborstone, Mr. Paredes Garcia submitted a second auto loan application that Harborstone denied because his DACA documentation was "not acceptable for financing." *Id.* at 10–14. Prior to the denial, Harborstone conducted a "hard" credit pull of Mr. Paredes Garcia's consumer credit score, resulting in a six-point drop in his score. *Id.* at 8, 11 & n.31. Based on this experience, Mr. Paredes Garcia claims that Harborstone engaged in a policy and practice of (1) wrongfully denying DACA participants and other noncitizen residents the opportunity to contract for credit in violation of 42 U.S.C. § 1981, and (2) wrongfully conducting hard credit pulls in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq. Id.* at 15–16, 20–23. On January 26, 2021, Mr. Paredes Garcia initiated this class action lawsuit against Harborstone in Pierce County Superior Court on behalf of two sub-classes: one specifically pertaining to Section 1981 and one specifically pertaining to FCRA. *Id.* at 16.

On March 1, 2021, Harborstone removed the action to federal court. Dkt. No. 1. After the Court denied Harborstone's motion to dismiss, Dkt. No. 15, the parties moved to stay the case in in order to pursue early settlement, Dkt. No. 22. In October 2022, the parties reached an agreement in principle, Dkt. No. 29, and in December 2022, they finalized a long form settlement agreement, Dkt. No. 30. Thereafter, Mr. Paredes Garcia filed his unopposed motion for preliminary approval of the settlement along with the parties' initial settlement agreement, proposed notice, and other supporting materials. Dkt. Nos. 33, 34-1–34-5. On June 2, 2023, the Court held a hearing to address questions raised by the proposed settlement and notice, *see* Dkt. Nos. 37–39, and the parties submitted an amended agreement for the Court's consideration on June 23, 2023, Dkt. No. 40-1. The Court then granted Mr. Paredes Garcia's motion for preliminary approval and appointed him as class representative, appointed Terrell Marshall Law Group PLLC as class counsel, and appointed Simpluris as settlement administrator. Dkt. No. 41 at 18–19. On July 24, 2023, Simpluris

began notifying class members in accordance with the parties' agreement and the approved notice plan. Dkt. No. 44 at 1–4; *see also* Dkt. No. 44-1–44-3 (mail and email notices).

On August 23, 2023, Mr. Paredes Garcia filed a motion for final approval of the settlement and attorneys' fees and costs, Dkt. Nos. 42–44, which he then supplemented on October 2, 2023 following the expiration of the opt out deadline, Dkt. Nos. 46–48. The Court held a final fairness hearing on November 6, 2023. Dkt. No. 51. Mr. Paredes Garcia, counsel for both parties, and a representative from Simpluris attended the hearing in person and telephonically, but no other class members were present.

**B.    Amended Settlement Agreement**

They key terms of the settlement are as follows.

1.    <u>Class Definition</u>

The class is defined as:

> All individuals who resided in the United States at the time they applied for a loan from Harborstone Credit Union, and for whom Harborstone obtained a credit report, and whose applications were declined at any time between January 26, 2018, and August 31, 2021 for the reason that they had a tax identification number because they were not permanent residents of the United States.

Dkt. No. 40-1 at 2.[1] The parties originally indicated that the class was comprised of 249 members, *id.* at 3, 14, but determined during the notice process that two class members were duplicated on Harborstone's class list, leaving a total of 247 possible class members, Dkt. No. 42 at 8 n.1; Dkt. No. 43 at 7. During the June 2, 2023 preliminary approval hearing, the parties provided additional clarity on how Harborstone identified the class members by pulling data based on loan application denials.

---

[1] Excluded from the Class are "(a) the judge to whom this case is assigned and any member of the judge's immediate family; (b) any officers, directors, agents, legal representatives, assignees, or successors of Harborstone Credit Union; (c) any entity in which Harborstone Credit Union has a controlling interest or that has a controlling interest in Harborstone Credit Union; and (d) any individual who has an active dispute with Harborstone Credit Union based on the facts asserted in Plaintiff's Complaint, filed in Pierce County Superior Court on January 26, 2021." *Id.*

2.  Class Compensation

Harborstone has agreed to pay $186,750 to establish a settlement fund, which will be divided equally among the class members into check payments. Dkt. No. 40-1 at 3–4. The shares of the settlement fund for class members who submitted valid exclusions will be divided evenly among the remaining class members who did not opt out. *Id.* at 4. Harborstone will separately provide up to $25,000 for settlement administration costs. *Id.* at 3, 5. And subject to Court approval, Harborstone has agreed to pay Mr. Paredes Garcia up to $5,000 as an award for serving as class representative, separate and apart from the settlement fund. *Id.* at 2, 5.

3.  Changes to Harborstone's Policies and Practices

Harborstone has agreed to implement the following changes to its policies and procedures:

(1) Harborstone Credit Union shall not maintain policies, practices, or guidelines that allow the evaluation of any person who is a non-United States citizen under any different guideline or standard than it would evaluate a person who is a United States citizen when considering whether to admit the person as a member or extend credit to the person;

(2) Harborstone Credit Union shall not require an applicant to provide documentation showing the applicant can remain in the United States legally through the maturity date of a loan for which the applicant has applied;

(3) Harborstone shall not consider an applicant's national origin, race, or immigration status as factors to evaluate creditworthiness, regardless of whether a person is a United States citizen; and

(4) Harborstone shall maintain language in its policies confirming that it does not discriminate on account of race, color, or national origin.

*Id.* at 7.

4.  Release

In exchange for the aforementioned relief and to settle all claims raised in this action, class members will be bound by the following release:

As of the Effective Date of this Amended Settlement Agreement, all Members of the Settlement Class, including Plaintiff, fully and finally release all claims that were or could have been brought against Harborstone Credit Union in the Action

(as well as its respective predecessors, successors, assigns, employees, officers, directors, insurers, and/or heirs) based on the facts asserted in Plaintiff's Complaint, filed in Pierce County Superior Court on January 26, 2021 (the "Release"). The scope of this Release shall be from January 26, 2018, to August 31, 2021. This Release specifically includes, but is not limited to, any claims for exemplary damages, statutory damages, compensatory damages, interest, fees, costs, attorneys' fees, and all other claims made in the Action or that could have been made in the Action based on the allegations in Plaintiff's Complaint.

*Id.* at 11.

5. Attorneys' Fees and Costs

Subject to Court approval and separate and apart from any other amount going toward settlement, Harborstone has agreed to pay up to $150,000 in attorneys' fees and costs to Mr. Paredes Garcia's counsel. *Id.* at 2, 6.

## II.   DISCUSSION

Under Federal Rule of Civil Procedure 23(e), the settlement of claims brought by a proposed class requires certification of the class, adequate notice to the class, and a fairness hearing before the Court to determine whether the settlement is fair, reasonable, and adequate. In this case, for the reasons set forth herein, the Court approves the parties' settlement.

**A.   Class Certification**

Before granting final approval of a class action settlement, courts must assess whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The reasoning underlying the Court's provisional certification of the class remains unchanged since its order preliminarily approving the settlement, and therefore the Court incorporates its prior analysis under Rule 23(a) and (b) as set forth therein. *See* Dkt. No. 41 at 5–8. Accordingly, the Court finds that Mr. Paredes Garcia has met his burden of showing that the requirements of Rule 23(a) are met and that the class is maintainable under

Rule 23(b) for purposes of settlement approval. *See, e.g.*, *Juarez v. Soc. Fin., Inc.*, No. 20-CV-03386-HSG, 2023 WL 3898988, at *3 (N.D. Cal. June 8, 2023) (certifying the settlement class for final approval when no material changes occurred between preliminary and final certification); *Lalli v. First Team Real Est.-Orange Cnty.*, No. 8:20-CV-00027-JWH-ADS, 2022 WL 8207530, at *4 (C.D. Cal. Sept. 6, 2022) (same).

**B.    Adequacy of Notice**

Under Rule 23, district courts must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 779 (9th Cir. 2022) (quoting Fed. R. Civ. P. 23(c)(2)(B)); *see also* Fed. R. Civ. P. 23(e)(1). Procedural due process, in turn, demands that the notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1045 (9th Cir. 2019) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974)). "[N]either Rule 23 nor the Due Process Clause," however, "requires actual notice to each individual class member." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

The Court previously approved the contents of the notice and the plan for its distribution, *see* Dkt. No. 41 at 15–22, and based on the record before it, finds that Mr. Paredes Garcia and Simpluris sufficiently implemented the notice process to meet the requirements of Rule 23 and the Due Process Clause.

Beginning on July 24, 2023, Simpluris issued settlement notices via U.S. Mail and email (where class members' email addresses were available) in English and Spanish, established a website with the settlement notices and information about this case, and set up a 24/7 toll-free telephone number that individuals could call regarding the settlement. Dkt. No. 44 at 1–4; *see also*

ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES AND COSTS - 6

Dkt. No. 44-1 at 2–7 (long form notice); Dkt. No. 44-2 at 2–8 (Spanish Language notice); Dkt. No. 44-3 at 2–8 (email notice). Prior to mailing out the hard-copy notices, Simpluris "scrubbed" the addresses on the class list to ensure they were in a proper format for mailing and compared the address data against the United National Change of Address ("NCOA") database, updating any addresses as necessary. Dkt. No. 44 at 3. Of the 247 original mailings, 46 were returned without a forwarding address. Dkt. No. 48 at 2. Simpluris then performed an advanced address search on those addresses using the class members' names and previous addresses to locate a more current address, and remailed notices to 35 class members at either a newfound address or a forwarding address provided by the United States Postal Service. *Id.* Simpluris sent the email notice to the 50 valid email addresses available for class members,[2] and, after accounting for two bounce backs, successfully delivered notice to at least 48 class members. Dkt. No. 44 at 3. Of the 50 class members who provided email contact information during the loan application process, 47 were contacted by both mail and email. Of the 11 class members who Simpluris was unable to contact by U.S. mail, one received notice by email. Thus, out of the 247 settlement class members, 10 could not be reached by either email or U.S. mail. In other words, notice was delivered to 96 percent of the class.

On August 25, 2023, the day after Simpluris posted the motion for final approval on the settlement website, it also sent follow-up emails to those class members with valid email addresses informing them that the motion had been posted and reminding them of the opt out date. Dkt. No. 47 at 1–2; *see* Dkt. No. 47-1 at 2–3 (reminder email). In total, the settlement website was visited by 2,674 unique visitors and viewed 4,349 times between July 24, 2023 and September 29, 2023, including 1,105 unique visitors and 1,783 page views between August 24th and September 22nd,

---

[2] During the final fairness hearing, class counsel clarified that loan applicants had the option to provide an email address to Harborstone when applying for loans, but only 50 chose to do so.

after Simpluris posted the motion for final approval. Dkt. No. 47 at 2; Dkt. No. 48 at 2. One person called the toll-free settlement telephone number and asked a few questions about the notice she received and about class counsel, but did not opt out or otherwise ask to be excluded. Dkt. No. 47 at 2; Dkt. No. 48 at 2.

In order to opt out of or object to the settlement, class members were required to send written notice to Simpluris via mail, email, or a form on the settlement website by September 22, 2023. *See* Dkt. No. 41 at 5, 17. As of September 29, 2023, one class member had asked to be excluded and none had objected. Dkt. No. 48 at 3, 5. Class counsel confirmed during the final fairness hearing that the number of opt outs remained unchanged since their most recent filing, and that no objections had been received.

Class counsel and Simpluris also confirmed during the final fairness hearing that this Order and a notification regarding payment authorization and mailing will be added to the settlement website, and that both the website and toll-free number will remain active until at least 30 days after the check cashing deadline. In addition, class counsel and Simpluris agreed to translate and post a Spanish language version of the Amended Settlement Agreement to the settlement website before payments are mailed to class members.

Based on the declarations submitted by class counsel and Simpluris indicating that they complied with the notice plan and provided notice to 96 percent of class members (by mail and/or email), and maintained a website that has had thousands of unique visits, Dkt. Nos. 44, 47–48, the Court is satisfied that class members received the "best notice that is practicable under the circumstances[.]" Fed. R. Civ. P. 23(c)(2)(B); *see also, e.g.*, *Kulik v. NMCI Med. Clinic Inc.*, No. 21-CV-03495-BLF, 2023 WL 2503539, at *6 (N.D. Cal. Mar. 13, 2023).

1    **C.**    **Settlement Approval**

2        1.    <u>Legal Standard</u>

3        As noted above, settlement of class actions must be fair, reasonable, and adequate. Fed. R.

4    Civ. P. 23(e)(2); *see Hanlon*, 150 F.3d at 1027 (explaining that because a "[s]ettlement is the

5    offspring of compromise[,] the question we address is not whether the final product could be

6    prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"). Indeed,

7    "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair

8    settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).

9    In addition to ensuring that adequate notice is provided to class members, *see* Fed. R. Civ. P.

10   23(c)(2)(B), (e)(1); *Hanlon*, 150 F.3d at 1025, district courts must balance a number of factors in

11   order to assess a settlement proposal. These factors include (1) whether the class representative

12   and class counsel have adequately represented the class; (2) whether the proposal was negotiated

13   at arm's length; (3) whether the relief provided for the class is adequate, taking into account (i) the

14   costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of

15   distributing relief to the class, including the method of processing class member claims; and

16   (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and

17   (4) whether the proposal treats class members equitably relative to each other. Fed. R. Civ. P.

18   23(e)(2)(A)–(D).

19       Furthermore, settlements that occur before formal class certification require a higher

20   standard of fairness. *See In re Apple*, 50 F.4th at 782; *accord Saucillo v. Peck*, 25 F.4th 1118,

21   1130–31 (9th Cir. 2022). When reviewing such settlements, courts must confirm that "the

22   settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*

23   *Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (cleaned up). "This more exacting review

24   [helps] to ensure that class representatives and their counsel do not secure a disproportionate

benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Roes, 1–2*, 944 F.3d at 1049 (cleaned up).

2.  Fairness, Reasonableness, and Adequacy

The Court finds that the Amended Settlement Agreement is "fair, reasonable, and adequate" considering the quality of representation provided by Mr. Paredes Garcia and class counsel, the arm's length negotiations between the parties, the adequacy of relief to class members, and the equitable treatment of class members relative to each other. Fed. R. Civ. P. 23(e)(2)(A)–(D).

### (a)  Adequacy of Representation

Mr. Paredes Garcia and class counsel have prosecuted this action vigorously on behalf of the class for nearly three years, investigating the potential claims, preparing the complaint, conducting discovery, surviving a motion to dismiss, and ultimately, negotiating a favorable resolution. Dkt. No. 43 at 7–8, 14; *see also* Dkt. No. 41 at 7–8. In addition, class counsel, who are experienced civil rights class action attorneys, *see* Dkt. No. 43 at 1–6, invested more than 500 hours into this case on a contingency basis, *id.* at 8–9, 13. The Court therefore finds that Mr. Paredes Garcia and class counsel have adequately represented the class, which weighs in favor of final approval. Fed. R. Civ. P. 23(e)(2)(A).

### (b)  Arm's Length Negotiations

The Court next finds that the Amended Settlement Agreement is the result of serious, informed, and arm's-length negotiations between attorneys versed in the legal and factual issues of the case. *See* Fed. R. Civ. P. 23(e)(2)(B). Although it does not appear that the parties conducted a formal mediation, the record reflects that following the Court's denial of Harborstone's motion to dismiss in August 2021, the parties exchanged substantial discovery and began engaging in good faith settlement negotiations which lasted for approximately one year. *See* Dkt. No. 43 at 7

1    (noting that "the parties exchanged hundreds of pages of documents and information that aided

2    their classwide settlement negotiations, including an anonymized list of Class Members, loan

3    application information, and policy documents"). In March 2022, class counsel conveyed Mr.

4    Paredes Garcia's first settlement offer to Harborstone, and after several rounds of back and forth

5    and the exchange of additional documents and information, Mr. Paredes Garcia accepted

6    Harborstone's third counteroffer on October 3, 2022. *Id.* Accordingly, because the record shows

7    no sign of collusion and instead indicates that the parties negotiated at arm's length, this factor

8    also weights in favor of final approval.

9                              *(c)      Adequacy of Relief*

10          The third factor the Court must weigh is whether the relief provided to the class members

11   is adequate under Rule 23(e)(2)(C) upon consideration of, among other things, the costs, risks, and

12   delay of trial and the effectiveness of any proposed method of distributing relief to the class. Under

13   this prong, the "relief that the settlement is expected to provide to class members is a central

14   concern." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. In total, Harborstone

15   has agreed to pay $186,750, which will be evenly divided among the 246 class members (not

16   including Mr. Paredes Garcia's $5,000 service award). *See* Dkt. No. 42 at 11 & n.1. Harborstone

17   has also agreed to provide injunctive relief that the parties estimate to be worth millions of dollars

18   of loans that Harborstone can no longer deny on the basis of citizenship or national origin. *See*

19   Dkt. No. 40-1 at 7; Dkt. No. 40 at 2; Dkt. No. 42 at 23. For the reasons discussed below, the Court

20   finds this relief to be adequate.

21                        (i)  Costs, Risks, and Delay of Trial and Appeal

22          With respect to the costs, risks, and delay of trial and appeal, Mr. Paredes Garcia argues

23   that although he withstood Harborstone's motion to dismiss, he remained concerned "that factual

24   development of the record may result in a summary judgment finding in Harborstone's favor."

ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND COSTS - 11

Dkt. No. 42 at 16–17. He further states that even if he "could successfully defend a summary judgment motion, he would still have to prove at trial that Harborstone is liable to every Class Member under both Section 1981 and the FCRA," and his counsel mentioned during the preliminary approval hearing that doing so would be challenging, particularly given the difficulty of quantifying the damages resulting from individual loan denials. *Id.* at 17; *see also* Dkt. No. 41 at 13–14 (discussing average class members' loan amounts). Further, assuming Mr. Paredes Garcia could prevail at trial and obtain a jury award of compensatory damages, class counsel estimates that Harborstone's appeal of the verdict would delay any recovery for class members by a year or more. Dkt. No. 42 at 17. Moreover, the ongoing litigation would be costly and time consuming, only adding to the benefit to class members of early settlement in this case. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (explaining that difficulties and risks in litigating weigh in favor of approving a class settlement); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").

Thus, despite the potential merits of the class members' Section 1981 claims, the Court finds that the more prompt and certain relief of $759.14 in damages to each of the 246 settlement class members, combined with the prospective relief for noncitizens who apply for future loans or membership with Harborstone, is adequate and weighs in favor of approval.

### (ii) Effectiveness of Proposed Method of Distributing Relief

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Beltran v. Olam Spices & Vegetables, Inc.*, No. 1:18-CV-1676-JLT-SAB, 2023 WL 5817577, at *12 (E.D.

Cal. Sept. 8, 2023) (quoting *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) (alteration in *Hilsley*)). The proposed method for processing claims "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. In this case, the parties' agreement provides that each settlement class member will automatically receive a check for their equal share of the $186,750 settlement fund without needing to file a claim form. Dkt. No. 40-1 at 4.

Although courts often approve this method of distribution, *see, e.g.*, *Ayala v. U.S Xpress Enters., Inc.*, No. ED-CV-16-137-GW-KKx, 2023 WL 6559786, at *6 (C.D. Cal. Sept. 15, 2023), the Court inquired during the final fairness hearing about additional safeguards that could help ensure that as many checks as possible reach the settlement class members. In response, class counsel stated that prior to mailing the checks, Simpluris will once again cross-check the mailing addresses on file against the NCOA database, and any newly found addresses will be processed through the United States Postal Services' Coding Accuracy Support System ("CASS"). Beyond this initial two-step verification, Simpluris will perform a skip trace for any checks returned as undeliverable. And for any settlement class members who cannot be reached by mail through the above-mentioned methods, Simpluris will work with class counsel and Harborstone to reach out by telephone to obtain a suitable mailing address, and if necessary, to utilize Westlaw PeopleMap and/or other tools to find contact information and ultimately obtain valid mailing addresses.

Furthermore, the settlement checks will have the 180-day cashing deadline printed on them, and the checks will be accompanied by a brief explanation for the payment as well as the settlement website address. Four months after the payment mailing, Simpluris will send a reminder postcard to all class members who have not cashed their checks. And last, the parties will file two joint status reports updating the Court as to how many checks reached class members and how

many checks have been cashed: first, four months after the checks are mailed out, and second, six months and two weeks after the checks are mailed out.

### (iii) Proposed Award of Attorneys' Fees

Class counsel seeks $150,000 in attorneys' fees. Dkt. No. 40-1 at 6; Dkt. No. 42 at 21. As explained below in Section II.D.1, the Court finds that the requested attorneys' fees are reasonable.

### (iv) Any Agreement Required To Be Identified Under Rule 23(e)(3)

Rule 23(e)(3) requires that parties "file a statement identifying any agreement made in connection with the [settlement] proposal." Fed. R. Civ. P. 23(e)(3). Mr. Paredes Garcia does not identify any such agreement in his filings, *see generally* Dkt. Nos. 42, 46, and the Court confirmed during the final fairness hearing that none exist. Thus, this factor does not apply.

### *(d)     Equitable Treatment*

Under Rule 23(e)(2)(D), the Court must consider whether the settlement agreement treats settlement class members equitably relative to each other. Here, each of the 246 settlement class members will receive an identical $759.14 share of the $186,750 settlement fund. *See* Dkt. No. 42 at 11 n.3; Dkt. No. 40-1 at 4. And, as explained below in Section II.D.4, the Court finds that the $5,000 service award to Mr. Paredes Garcia does not weigh against the equity of the class compensation on the whole. Thus, the Court finds that the agreement treats all class members equitably and this factor also weights in favor of approval. *See, e.g.*, *Lalli*, 2022 WL 8207530, at *7.

### 3.   Pre-Certification Factors

In addition to the Rule 23(e)(2) factors weighed above, the Court must also determine whether this settlement meets the higher standard of fairness applied to settlements occurring before formal class certification. *See In re Bluetooth*, 654 F.3d at 946. As the Ninth Circuit has cautioned, collusion in this context "may not always be evident on the face of a settlement, and

1   courts therefore must be particularly vigilant not only for explicit collusion, but also for more

2   subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain

3   class members to infect the negotiations." *Id.* at 947; *accord Saucillo*, 25 F.4th at 1130–31.

4   Therefore, proposed agreements preceding formal class certification must be examined for more

5   "subtle signs" of collusion, such as (1) counsel receiving a disproportionate distribution of the

6   settlement; (2) the parties negotiating a "clear sailing" arrangement, which carries the potential of

7   enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel

8   accepting an unfair settlement on behalf of the class; and (3) the parties creating a reverter that

9   returns unclaimed funds to the defendant. *Roes, 1-2*, 944 F.3d at 1049.

10                     (a)    *Proportionality of Attorneys' Fees*

11          Class counsel requests $150,000 in attorneys' fees, separate and apart from the $186,750

12   settlement fund. Dkt. No. 40-1 at 2–3, 6. "[A]greement on attorneys' fees should be viewed as a

13   'package deal'" in so far as it reflects "the defendant's overall willingness to pay." *In re Bluetooth*,

14   654 F.3d at 949 (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996));

15   *accord Roes, 1-2*, 944 F.3d at 1051. "The typical range of acceptable attorneys' fees in the Ninth

16   Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark."

17   *Beltran*, 2023 WL 5817577, at *11 (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000));

18   *accord In re Bluetooth*, 654 F.3d at 942. Of the $366,750 total cash going toward settlement,

19   approximately 41% will go toward attorneys' fees. However, this figure jumps to 80% if calculated

20   against the $186,750 going to class members. Mr. Paredes Garcia contends that if the Court were

21   to factor in the monetary value of the injunctive relief included in the settlement—a "conservative

22   average of $3 million in loans per year that may potentially become available to non-U.S. citizen

23   applicants"—the $150,000 fee request "is only 4.5 percent of the total value of the settlement in

24   the first year (with additional value accumulating in following years due to the prospective relief

ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND COSTS - 15

obtained)." Dkt. No. 42 at 23 & n.8 (footnote omitted).

There is some basis in the record for factoring in the value of this injunctive relief. The total amount of loans for which class members applied in 2020 and 2021 was $2,399,123 and $3,606,072, respectively. Dkt. No. 41 at 13–14. But the Ninth Circuit has explained that "a district court must exercise caution when using the value of injunctive relief to determine proportional attorneys' fees and should generally[ avoid valuing hard-to-measure injunctive relief altogether[.]" *Kim v. Allison*, 8 F.4th 1170, 1181 (9th Cir. 2021); *see also In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (en banc) ("When valuing the settlement is difficult or impossible, the lodestar method may prove more convenient[.]"). Given that district courts maintain discretion to employ either the percentage-of-recovery method or the lodestar method to assess the reasonableness of any attorneys' fee award—the latter of which the Court utilizes below—the Court does not find that class counsel's attorneys' fee request is so disproportionately above the 25% benchmark as to raise legitimate concerns of collusion. *See, e.g.*, *Lalli*, 2022 WL 8207530, at *6 (finding an attorneys' fee request constituting 43% of the total settlement fund to be "steep, but not necessarily ***disproportionate***"); *Juarez*, 2023 WL 3898988, at *7 (awarding $300,000 in attorneys' fees and costs with a total of $155,000 distributed to class members the attorneys' fees were reasonable under the lodestar method); *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, No. C17-541-RSM, 2018 WL 5013764, at *3–4 (W.D. Wash. Oct. 16, 2018) (concluding that the settlement was fair, reasonable, and adequate where the attorney fee request constituted 93.67% of the recovery based on the total sum defendants were willing to pay), *aff'd sub nom. Johnson v. MGM Holdings, Inc*, 943 F.3d 1239 (9th Cir. 2019), and *aff'd sub nom. Johnson v. MGM Holdings, Inc*, 794 F. App'x 584 (9th Cir. 2019). Moreover, although it may be difficult to quantify the precise monetary value of the injunctive relief provided as part of settlement agreement, the Court is confident based on the record before it that there is a sufficient

monetary value to move the proportionality of attorneys' fees closer to the benchmark. Accordingly, the Court finds that this factor does not weigh against final approval.

### (b)   Clear Sailing Agreement

The parties' agreement also includes a clear sailing arrangement because Harborstone has agreed not to object to the $150,000 fee request. Dkt. No. 40-1 at 2–3, 6; *see Roes, 1-2*, 944 F.3d at 1049. "Although clear sailing provisions are not prohibited, they by their nature deprive the court of the advantages of the adversary process in resolving fee determinations and are therefore disfavored." *In re Bluetooth*, 654 F.3d at 949 (cleaned up). Therefore, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding unreasonably high fees simply because they are uncontested." *Id.* at 948 (quotation marks omitted).

The Court cautioned the parties during the preliminary approval hearing that it would carefully scrutinize the reasonableness of the requested attorneys' fee award at the final approval stage. However, using the lodestar method to evaluate the fee request in this case, the Court does not find that the clear sailing provision weighs against final approval. *See infra* Section II.D.1.

### (c)   No Reversion; Cy Pres Beneficiaries

With respect to the third factor, the Amended Settlement Agreement expressly provides that "[t]here shall be no reversion to Harborstone Credit Union of any portion of the Settlement Fund." Dkt. No. 40-1 at 7. The agreement further mandates that if a class member's check is not cashed within 180 days of mailing, the associated funds shall become "residual funds" and be re-disbursed evenly between two nonprofit organizations, the Mexican American Legal Defense and Educational Fund and the Northwest Justice Project, to advocate for consumer rights issues affecting DACA recipients or other undocumented people living in the United States. *Id.* at 6; *see*

*also* Dkt. No. 42 at 11.

For the reasons stated in its preliminary approval order, the Court finds that there is a sufficient nexus between the *cy pres* beneficiaries and the settlement class, and that this redistribution of funds is thus appropriate. Dkt. No. 41 at 11; *see also In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1111, 1116 (9th Cir. 2021), *cert. denied sub nom. Lowery v. Joffe*, 143 S. Ct. 107 (2022).

4. *Churchill* Factors

In addition to the above-mentioned factors under Rule 23(e)(2), district courts generally still consider the eight "*Churchill* factors": (1) the strength of a plaintiff's case; (2) the risk, expense, complexity, and likely duration of additional litigation; (3) the risk of maintaining class action status throughout trial; (4) the settlement amount; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and opinions of counsel; (7) the presence of a governmental participant; and (8) the reaction of Class Members to the settlement amount. *See Kim*, 8 F.4th at 1178; *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Many of these factors "fall within the ambit of the revised Rule 23(e)," and have therefore been discussed above as part of the Court's analysis. *Briseño v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021). Nevertheless, the Court briefly notes that no governmental participants are implicated, the reaction of the class weighs in favor of approval, and the settlement payment to each class member is either greater than or consistent with awards in other similar cases. As mentioned previously, only one individual requested to be excluded from the settlement class, and none objected either in writing pursuant to the agreement or at the fairness hearing. Dkt. No. 48 at 3, 5; Dkt. No. 51. Accordingly, in light of the positive reaction of the class, and for the reasons stated above, the Court finds that the *Churchill* factors weigh in favor of approval. *See In re Bofl Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2022 WL 9497235, at *7 (S.D. Cal. Oct. 14, 2022) (finding that a low

number of opt outs or objectors supports the conclusion that the relief provided to class members is adequate).

**D.      Attorneys' Fees and Costs, Expenses, and Service Award**

Consistent with the parties' agreement, class counsel asks the Court to approve an award of $150,000 in attorneys' fees and costs, up to $25,000 in settlement administration expenses to Simpluris, and a $5,000 service award to Mr. Paredes Garcia. Dkt. No. 40-1 at 3, 5–6; *see also* Dkt. No. 42 at 18–23, 25–27.

1.      <u>Attorneys' Fees</u>

(a)      *Legal Standard*

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). District courts, however, "have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. Courts can employ one of two methods: the lodestar or a percentage of the recovery. *In re Apple Inc.*, 50 F.4th at 784. Under the lodestar method, the court "multiplies the number of hours the prevailing party reasonably spent on litigation by a reasonable hourly rate to determine a presumptively reasonable fee award," which can then be adjusted "by an appropriate positive or negative multiplier" based on factors such as "the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Kim*, 8 F.4th at 1180–81 (quoting *In re Bluetooth*, 654 F.3d at 941–42). As discussed in Section II.C.3(a), the percentage of the recovery method considers fees as a percentage of a recovered common fund, with a benchmark percentage of 25%. Like the lodestar, this percentage can be adjusted upward or downward. *In re Apple Inc.*, 50 F.4th at 784. And while district courts may employ either method, whichever method is chosen, "courts often employ the other method as a

1    cross-check that the award is reasonable." *Id.*; *see also In re Bluetooth*, 654 F.3d at 942 ("Though

2    courts have discretion to choose which calculation method they use, their discretion must be

3    exercised so as to achieve a reasonable result.").

4             (b)    *Analysis*

5             Here, the Court finds that class counsel's $150,000 request for attorneys' fees and costs is

6    reasonable under the lodestar method.[3] Because precisely valuing the overall settlement, including

7    injunctive relief, is difficult based on the current record, the Court finds that the lodestar method

8    is both more convenient and more appropriate. *In re Hyundai*, 926 F.3d at 570; *see also Roes, 1-*

9    *2*, 944 F.3d at 1056 ("[F]or purposes of performing the lodestar cross-check using a percentage of

10   the total class recovery," district courts may "exclude[] the injunctive relief from the valuation of

11   the settlement and explain[] why [the proposed] attorneys' fees . . . [a]re justified."); *Johnson*,

12   2018 WL 5013764, at *6, 12 (finding the lodestar method more appropriate where the settlement

13   "did not create a true common fund as it did not establish a single sum for both class compensation

14   and attorneys' fees," and part of the relief obtained was injunctive relief). Furthermore, the lodestar

15   method "is appropriate in class actions brought under fee-shifting statutes," *In re Bluetooth*, 654

16   F.3d at 941, and Mr. Paredes Garcia brought a claim pursuant to 42 U.S.C. § 1981, which is subject

17   to fee-shifting under 42 U.S.C. § 1988(b), *see, e.g.*, *Roberts v. City of Honolulu*, 938 F.3d 1020,

18   1023 (9th Cir. 2019); *see also* Dkt. No. 1-1 at 20–21 (Section 1981 claim in complaint).

19           With respect to the reasonableness of the hours expended, class counsel accrued 506.25

20   hours litigating this case between September 2020 and August 2023, the vast majority of which

21   (419.4) are attributed to Eric R. Nusser, member of Terrell Marshall and 2016 graduate of Seattle

22   University School of Law. Dkt. No. 43 at 2, 10–13; Dkt. No. 43-1 at 2–26 (detailed billing entries).

---

[3] The request for attorneys' fees alone is $149,668.37 after deducting the $331.63 in costs. Dkt. No. 43 at 13; *see* Dkt. No. 43-2 at 2 (costs invoice).

1  The Court has reviewed the remainder of the billing entries submitted by class counsel, *see* Dkt.

2  No. 43-1 at 2–35, and finds that the number of hours spent litigating this case over nearly three

3  years, through investigation and research, filing the complaint, opposing the motion to dismiss,

4  conducting discovery, and finalizing and administrating the settlement, is reasonable in this case.

5      As for class counsel's hourly rates, they vary from $125 an hour for legal assistants to $575

6  an hour for founding member of Terrell Marshall, Toby J. Marshall. Dkt. No. 43 at 2, 10–13.[4]

7  When determining a reasonable hourly rate, courts generally consider the "experience, skill and

8  reputation of the attorney requesting fees," *Trevino v. Gates*, 99 F.3d 911, 924 (9th Cir. 1996)

9  (quoting *Schwarz v. Sec'y of Health & Hum. Servs.*, 73 F.3d 895, 908 (9th Cir. 1995)), as well as

10  "the prevailing market rates in the relevant community[.]" *Blum v. Stenson*, 465 U.S. 886, 895

11  (1984). The relevant community is the forum in which the district court sits. *Camacho v.*

12  *Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). The party seeking an award of attorneys'

13  fees bears the burden of producing "satisfactory evidence—in addition to the attorney's own

14  affidavits—that the requested rates are in line with those prevailing in the community for similar

15  services" by comparable lawyers. *Blum*, 465 U.S. at 895 n.11; *accord Chaudhry v. City of Los*

16  *Angeles*, 751 F.3d 1096, 1110 (9th Cir. 2014).

17      Mr. Nusser avers in his declaration in support of the motion for final approval that class

18  counsel set their rates for both attorneys and staff members "based on a variety of factors, including

19  among others: the experience, skill, and sophistication required for the types of legal services

20  typically performed; the rates customarily charged in the markets where legal services are typically

---

22  [4] The specific hourly rates are as follows: (1) $575 per hour for founding member and attorney Toby J. Marshall;

23  (2) $375 per hour for member and attorney Eric R. Nusser; (3) $200 per hour for second-year law student and law
   clerk Tory White; (4) $195 for senior paralegal Jennifer Boschen; (5) $150 per hour for paralegals Heather Brown and
   Jessica Langsted, as well as legal assistants Holly Rota and Jennifer Murphy; and (6) $125 per hour for legal assistants

24  Bradford Kinsey, Ana Amezaga, Christine Vu, Eva Thomas, Lauren Carter, and Tanya Stewart. Dkt. No. 43 at 10–
   13; Dkt. No. 43-1 at 2–35.

ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND COSTS - 21

performed; and . . . experience, reputation and ability[.]" Dkt. No. 43 at 9. He also includes additional information about his and Mr. Marshall's backgrounds, Terrell Marshall's experience as a firm, and the contributions of their supporting staff. *See id.* at 1–6, 9–13.

District judges can also "consider the fees awarded by other judges in the same locality in similar cases," *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008), and rely on their own knowledge and familiarity with the legal market in setting a reasonable rate, *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (per curiam). Based on the totality of the record, the Court's familiarity with the legal market, and the fees awarded by other judges, the Court is satisfied that the hourly rates requested here are reasonable. *See, e.g.*, *Byles v. Ace Parking Mgmt., Inc.*, No. C16-0834-JCC, 2019 WL 3936663, at *1 (W.D. Wash. Aug. 20, 2019) (approving hourly rates between $300 per hour to $550 per hour); *Wilbur v. City of Mount Vernon*, No. C11-1100-RSL, 2014 WL 11961980, at *3 (W.D. Wash. Apr. 15, 2014) (finding rates between $190 and $580 to be reasonable in a civil rights class action lawsuit brought by, among others, Toby Marshall); *see also Nadarajah v. Holder*, 569 F.3d 906, 918 (9th Cir. 2009) (granting paralegal and law student rates that were "in line with those rates prevailing in the community for similar services by paralegals of reasonably comparable skill, experience and reputation" (cleaned up)); *Allstate Indem. Co. v. Lindquist*, No. C20-1508-JLR, 2021 WL 4226155, at *3 (W.D. Wash. Sept. 16, 2021) (approving a $300 hourly rate for legal assistants).

In addition, as of August 22, 2023, class counsel stated that their lodestar was $187,395.50, and estimated that this figure would increase as they accrued additional hours completing the settlement process. Dkt. No. 43 at 8; Dkt. No. 43-1 at 35. During the final fairness hearing, class counsel represented that their lodestar as of November 6, 2023 was $206,283. As a result, their attorneys' fee requests represent a "negative" multiplier of approximately 0.73 on their total lodestar, which bolsters the reasonableness of the fee request. *See, e.g.*, *In re Hyundai*, 926 F.3d at

572. And last, with respect to the utility of lodestar crosscheck using a percentage of recovery method, as explained above, because the $150,000 request represents somewhere between 4.5 and 80 percent of the relief to the class (depending on the estimation of the monetary value of Harborstone's changes in policies for granting loans to noncitizens), the Court finds that "[t]his case does not easily lend itself to consideration of a percentage cross-check." *Johnson*, 2018 WL 5013764, at *10; *see also id.* at *12 (approving attorneys' fees that "seem[ed] unreasonably large relative to the relief obtained for the class" where the recovery provided did not lend itself to a percentage-of-recovery calculation, and taking "solace in the hope that all things being equal, it seems more defensible that class attorneys, rather than defendants, receive the excess, as they will likely reinvest it in future class action cases." (cleaned up)); *supra* Section II.C.3(a).

### 2. Costs

Class counsel are permitted to recover reasonable expenses that "would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1216 n.7 (9th Cir. 1986), *reh'g denied and opinion amended*, 808 F.2d 1373 (9th Cir. 1987)). Class counsel in this case represent that $331.63 of the $150,000 will cover out-of-pocket costs for service ($77), filing fees ($241.50), and legal research fees ($13.13). Dkt. No. 43 at 13–14; Dkt. No. 43-2 at 2. Because these costs were reasonable and necessary, and the types of costs normally charged to a paying client, the Court approves them.

### 3. Settlement Administration Expenses

The Amended Settlement Agreement provides that Harborstone will pay up to $25,000 to Simpluris for settlement administration expenses. Dkt. No. 40-1 at 5–6. Simpluris represents that its "total costs for services in connection with the administration of this Settlement, including fees incurred and anticipated future costs for completion of the administration, are capped at $12,000.00." Dkt. No. 44 at 4; *see* Dkt. No. 48 at 3 (same). At the final fairness hearing, Simpluris

1    confirmed that any charge for the additional work of translating the amended agreement into

2    Spanish, updating the settlement website, distributing the payment to class members as described

3    above, and performing related tasks such as skip-tracing and sending reminders to class members

4    who have not cashed their checks after four months, will be covered either by the $12,000 agreed

5    amount or by additional funds not to exceed $25,000 total. *See supra* Section II.C.2(c)(ii).

6       4.   Service Award

7       Service or "incentive" awards to named plaintiffs are commonplace in class actions and

8    "intended to compensate class representatives for work done on behalf of the class, to make up for

9    financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

10   willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. When evaluating

11   the propriety of such payments, district courts consider, among other factors, "'the actions the

12   plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted

13   from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,'

14   and any financial or reputational risks the plaintiff faced." *In re Apple Inc.*, 50 F.4th at 786 (cleaned

15   up); *see also id.* at 787 ("So long as [service payments] are reasonable, they can be awarded.").

16      Mr. Paredes Garcia seeks a $5,000 class representative service award. Dkt. No. 40-1 at 5;

17   *see also* Dkt. No. 42 at 26–27. Class counsel aver that Mr. Paredes Garcia "was instrumental to

18   the case and the settlement," assisted "in investigating the claims, preparing the complaint, and

19   drafting discovery requests," and "took a central role in settlement negotiations, including helping

20   to craft prospective relief benefitting the Class and future applicants." Dkt. No. 43 at 7–8; *see also*

21   *id.* at 14 (describing Mr. Paredes Garcia's active role in the litigation, including reviewing the

22   settlement paperwork and other litigation documents, as well as the risk he assumed bringing these

23   claims against a financial institution where he is still a member and owes money on an auto loan).

24   Mr. Paredes Garcia also attended the final fairness hearing. The Court finds that the $5,000 service

ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND ATTORNEYS' FEES AND COSTS - 24

1    award is relatively modest in comparison to the approximately $186,000 in direct monetary relief

2    he helped generate for the 245 other settlement class members. Considering the circumstances of

3    this case and the proportionality between the award amount and Mr. Paredes Garcia's service to

4    the class, the $5,000 service award is reasonable to compensate Mr. Paredes Garcia for his efforts,

5    and the Court grants this request. *See, e.g.*, *Juarez*, 2023 WL 3898988, at *8.

### III.   CONCLUSION

Based on the foregoing, Mario Paredes Garcia's Motion and Supplemental Motion for Final Approval of Class Action Settlement and Attorneys' Fees and Costs, Dkt. Nos. 42, 46, are GRANTED, and the Court ORDERS as follows:

1. The Amended Settlement Agreement is fair, reasonable, and adequate;

2. The terms of the parties' Amended Settlement Agreement, Dkt. No. 40-1, are hereby fully incorporated as though set forth in this Order, including the Release of Claims in Section III and the provision agreeing that the Court will retain jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Amended Settlement Agreement and this Order, *id.* at 11–13;

3. Harborstone must pay $186,750 to establish the settlement fund in accordance with the Amended Settlement Agreement;

4. Harborstone must pay attorneys' fees and costs to class counsel in the amount of $150,000;

5. Harborstone must pay Simpluris settlement administrator costs of no more than $25,000;

6. Harborstone must pay an incentive award to Mr. Paredes Garcia in the amount of $5,000;

7. The parties must implement this relief in accordance with this Order and the Amended

Settlement Agreement;

8. The parties must update the Court as to how many checks have reached class members and how many have been cashed four months after the initial mailing of payment, as well as six months and two weeks after the initial mailing of payment; and

9. This action is dismissed with prejudice, without fees or costs to any party except as provided in the Amended Settlement Agreement.

Dated this 9th day of November, 2023.

Lauren King
United States District Judge